ATTORNEY FOR PETITIONER:

**MELISSA G. MICHIE**
FAEGRE DRINKER BIDDLE &
REATH, LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:

**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**J. DEREK ATWOOD**
**LYDIA A. GOLTEN**
**STEPHEN J. REEN**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

CHRIS BOUGIE, )
)
   Petitioner, )
)
      v. )  Case No. 23T-TA-00017
)
GAIL CHAPMAN in her official capacity as the )
KOSCIUSKO COUNTY ASSESSOR, )
)
   Respondent. )

FILED

Sep 18 2024, 1:07 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**September 18, 2024**

ROBB, Senior J.

    Taxpayer Chris Bougie challenges the Indiana Board of Tax Review's final determination increasing his 2021 and 2022 property tax assessments. Bougie contends that the Board arbitrarily accepted appraised values for his property, made conclusions that were unsupported by substantial or reliable evidence, and violated his Fourth Amendment right against unreasonable searches. He also asserts that the Board inappropriately applied the burden of proof to him instead of the Assessor. Having duly

considered these claims, the Court affirms the Board's final determination.

## FACTS AND PROCEDURAL HISTORY

Bougie owns a two-story residence of just more than 2,800 square feet and a one-car attached garage on a 0.16-acre non-waterfront lot in Winona Lake, Indiana. (*See* Cert. Admin. R. at 304-05.) In 2014, Bougie purchased the property, which then had a 1,200 square foot one-story residence. (*See* Cert. Admin. R. at 304-05, 641 ¶ 19.) He planned to substantially renovate and expand the residence, with the intention of increasing the potential living space by over 1,600 square feet. (*See* Cert. Admin. R. at 477-78.) The Assessor recorded the renovations as complete on Bougie's 2021 and 2022 property record cards. (*See* Cert. Admin. R. at 304-07.)

The Assessor assessed the property at $223,900 for 2021 and $282,000 for 2022, an increase from the $167,000 assessment for 2020. (*See* Cert. Admin. R. at 304-07.) Bougie contested the assessments to the Kosciusko County Property Tax Assessment Board of Appeal (PTABOA), which upheld the assessments. Bougie then appealed to the Board of Tax Review.

At the Board, Bougie requested a 20.1 percent reduction in his assessments, arguing they were not uniform and equal with other properties in the area and contested the validity of the Assessor's finding that the expansion to the potential living space was complete. (*See* Cert. Admin. R. at 674, 740.) The Assessor presented appraisals valuing the property at $279,000 for 2021 and $362,800 for 2022. (*See* Cert. Admin. R. at 489-567, 724-28.)

The Board found that Bougie failed to provide probative evidence to support his requested reduction. (*See* Cert. Admin. R. at 635 ¶ 1.) It also found the second-floor

expansion to be "substantially finished living area." (*See* Cert. Admin. R. at 641 ¶ 20.) On the other hand, the Board found the Assessor's appraisals to be reliable evidence of the property's market value-in-use and ordered the assessments changed to $279,000 for 2021 and $362,800 for 2022, in line with the appraisal values. (*See* Cert. Admin. R. at 654 ¶ 56, 655 ¶ 61.)

Bougie then filed this original tax appeal.

**STANDARD OF REVIEW**

The Court's review of Indiana Board decisions is governed by Indiana Code section 33-26-6-6, the provisions of which closely mirror those controlling the judicial review of administrative decisions governed by Indiana's Administrative Orders and Procedures Act ("AOPA"). *Compare* IND. CODE § 33-26-6-6(e) (2024) *with* IND. CODE § 4-21.5-5-14(d) (2024). Under Indiana Code section 33-26-6-6, the party seeking to overturn a final determination of the Indiana Board bears the burden of demonstrating its validity. I.C. § 33-26-6-6(b). The challenger must demonstrate that it has been prejudiced by a final determination of the Indiana Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. I.C. § 33-26-6-6(e).

The Legislature has specifically designated the Indiana Board as the trier of fact, charged with determining the relevance and weight to be assigned to the evidence before it. *See* IND. CODE § 6-1.1-15-4(p) (2024). Like the review of administrative decisions subject to AOPA, this Court reviews legal conclusions *de novo* but affords

3

deference to the factual determinations of the Indiana Board if they are supported by substantial and reliable evidence. *See* I.C. § 33-26-6-6(e)(5); *Indiana Alcohol & Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 375 (Ind. 2017) (articulating the standard of review of administrative actions under AOPA); *Kellam v. Fountain Cnty. Assessor*, 999 N.E.2d 120, 122 (Ind. Tax Ct. 2013) (articulating the standard of review for Indiana Board decisions), *review denied*. The Court may not substitute its judgment for that of the Indiana Board by reweighing the evidence or reevaluating the credibility of witnesses. *See* IND. CODE § 33-26-6-3(b) (2024); *Kellam*, 999 N.E.2d at 122.

**DISCUSSION AND DECISION**

*Was the Board's Acceptance of Appraised Values Arbitrary?*

Bougie argues that the Board accepted arbitrary and unsupported values from the Assessor's appraiser for his property assessments in 2021 and 2022. (Pet'r Br. at 2-3.) For the Board's determination to be arbitrary and capricious, it must be without some basis on which a reasonable person could reach the same conclusion. *Monroe Cnty. Assessor v. Kooshtard Prop. I, LLC*, 38 N.E.3d 754, 758 (Ind. Tax Ct. 2015). The Court will now review the appraisals and the Board's acceptance of their appraised values.

The Assessor submitted appraisals for 2021 and 2022 prepared by Iverson C. Grove, a member of the Appraisal Institute. (*See* Cert. Admin. R at 490-92, 529-531.) Grove used the sales comparison approach[1] to appraise the subject property. He did

---

[1] The sales comparison approach "estimates the total value of property directly by comparing it to similar, or comparable, properties that have sold in the market." 2021 REAL PROPERTY ASSESSMENT MANUAL ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2021) at 2.

4

not develop the income approach[2] because the property is owner-occupied, and he did not use the cost approach[3] because he was not allowed access to the property. (*See* Cert. Admin. R at 492, 531.)

Grove's sales comparison approach for each assessment year included sales from a nearby neighborhood[4] because he said there were not enough sales in Bougie's neighborhood to produce a proper sales comparison. (*See* Cert. Admin. R at 725-26.) Grove first appraised the property's land. He applied a "low side bias" from the range of values for Bougie's land to reflect that some of the comparable sales were from the island, where the land is generally more valuable. (*See* Cert. Admin. R at 501, 541.) This resulted in land values of $34,200 for 2021 and $39,000 for 2022. (*See* Cert. Admin. R at 501, 541.)

For 2021, Grove identified five sales of comparable homes. (*See* Cert. Admin. R at 503.) After deducting the land values, he determined the price per square foot and then adjusted the prices by the grade applied to the home to account for its construction quality. (*See* Cert. Admin. R at 503-04.) After adjustments, the values per square foot ranged from $87.18 to $171.23. (*See* Cert. Admin. R at 503.) Grove applied $87 per square foot, the lowest end of the range, to Bougie's property, though he noted that "[by]

---

[2] The income approach "is used for income producing properties that are typically rented. It converts an estimate of income, or rent, the property is expected to produce into value through a mathematical process known as capitalization." Manual at 2.

[3] The cost approach "estimates the value of land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value." *Id*.

[4] For property tax purposes, all property within a county is separated into neighborhoods defined by the assessor. Neighborhoods are established based on multiple factors, including common development characteristics, the size of the lots or tracts, schools and other taxing district boundaries, sales statistics, and other characteristics. REAL PROPERTY ASSESSMENT GUIDELINES FOR 2021 (incorporated by reference at 50 I.A.C. 2.4-1-2(c)), Ch. 2.

condition, considering the age of the subject, it is likely closer to the higher end of this range." (*See* Cert. Admin. R at 504.) This resulted in an improvement value of $244,800 and a total 2021 property value of $279,000. *Id*.

For 2022, Grove identified seven sales of comparable homes. (*See* Cert. Admin. R at 542.) After deducting the land values, he determined the price per square foot and then adjusted the prices by the grade applied to the home to account for its construction quality. (*See* Cert. Admin. R at 542-43.) After adjustments, the values per square foot ranged from $93.05 to $169.09. (*See* Cert. Admin. R at 542-43.) Grove applied $114 per square foot, near the lower end of the range, to Bougie's property, though he again noted that "[by] condition, considering the age of the subject, it is likely closer to the higher end of this range." (*See* Cert. Admin. R at 543.) This resulted in an improvement value of $323,800 and a total 2021 property value of $362,800. (*See* Cert. Admin. R at 543.)

Bougie presented evidence of how assessments on different properties in his neighborhood and the broader area accounted for renovations. (*See* Cert. Admin. R at 80-154.) From his analysis, he determined that assessments on these properties' property record cards did not fully account for the value of renovations as they were listed on the respective building permits. (*See* Cert. Admin. R at 80-154.) He argues, therefore, that his assessment, which increased more than the value of renovations listed on his building permits, should be lowered in accord with the treatment of other renovated properties. (*See* Cert. Admin. R at 739-40.)

Bougie also analyzed sales and assessment information for four properties the Assessor presented as comparable sales at the PTABOA hearing showing that they had

assessed values an average of 31.65 percent lower than their sales prices. (*See* Cert. Admin. R at 154.) He also submitted two appraisals he had prepared for nearby properties that showed that their sales prices were considerably lower than the amounts listed on their respective construction permits. (*See* Cert. Admin. R at 276-97.) From this information he concluded that assessments were based on market value-in-use of a property, which he asserts is a percentage discount of its potential sales price. (*See* Cert. Admin. R at 692, 705, 734.) Bougie does not, however, provide any evidence that this is a generally recognized appraisal principle to determine market value-in use as required. 2021 REAL PROPERTY ASSESSMENT MANUAL ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2021) at 2-3.

Bougie misunderstands market value-in-use. It represents the "price that would induce the owner to sell the real property, and the price at which the buyer would purchase the real property for a continuation of use of the property for its current use." *Id*. The proper assessment value (market value-in-use) in Indiana is not, as it is in some states, a set fraction of the likely market value of the property.

The Board found that Bougie, though offering lots of computations and theories, "did not offer any market-based evidence to show the true tax value of the subject property." (*See*, e.g., Cert. Admin. R at 635 ¶ 1.) It, meanwhile, found that "the Assessor offered appraisals . . . that provide reliable, market-based opinions of the subject property's true tax value as of each assessment date." (Cert. Admin. R at 635 ¶ 1.)

After analysis of the parties' arguments and a thorough review of the record, the Court finds that there is considerable basis on which a reasonable person could reach the same conclusion the Board did. Here, Bougie has made allegations, but he does not

7

provide probative evidence to support his contention that either the process or the result was improper. The appraisal valuations were done by a person skilled in doing evaluations and provided sufficient basis for the result. The valuation process appears proper, and Grove took lower values not high values from the estimate to the taxpayer's advantage including for the property's interior quality grade because he could not get entry to the subject property.

*Was Determination that Living Space Was Finished Supported by Substantial and Reliable Evidence?*

Bougie contends that the Board's findings in the final determination are unsupported by substantial or reliable evidence. (Pet'r Br. at 4-9.) Specifically, he argues that the "evidence presented does not support the conclusion that the subject property was substantially finished living space." (Pet'r Br. at 4 (emphasis omitted).) He further asserts that the "evidence presented as probative market based assessments of the subject property relies on hearsay to establish its accuracy." (Pet'r Br. at 7 (emphasis omitted).) The core of both arguments involves the evidentiary value of the information the Assessor and Grove relied on to conclude that the second-floor addition was completed.

A reviewing court may overturn a decision for lack of substantial evidence only if the agency's conclusions are shown to be clearly erroneous given all the evidence. *Moriarity v. Indiana Dep't Nat. Res.*, 113 N.E.3d 614, 622 (Ind. 2019). The Court will now review Bougie's arguments and the record to determine whether the Board's conclusion was clearly erroneous in light of the evidence.

Bougie asserts that the Board incorrectly concluded that the second story of his property was substantially finished living space despite his claims that it was unfinished. He objects to the prior assessor Susan Engelberth's "reasons for so accusing me [] that there are blinds, drapes, and a window air conditioner in my upper floor and there is an upper wood deck with patio chairs on it." (Pet'r Br. at 5 (internal quotation marks ommitted).) He states that he "resent[s] the unfounded accusation that my upstairs is finished. For one, a simple call asking me about it would have been a proper response to her suspicions." (Pet'r Br. at 5.)

At the Board hearing, he challenged the significance of these items and states that:

> truth be told that we sometimes let the kids run around upstairs to let off a little energy. It's open space and they need the room. We use the space similar to other people who have unfinished space. But if they put up window curtains and an old sofa and hang out there sometimes do they now have a finished basement? We do use the upstairs a little. We store stuff in it. We occasionally have a coffee and go upstairs to enjoy the view out toward the lake, but that doesn't make it finished.

(Cert. Admin. R at 712-13.)

The Assessor also sought to obtain information about the completion of Bougie's renovations from Winona Lake Building Commissioner Gene Seiman, who sent Bougie a letter on June 28, 2022, informing him that he would issue a certificate of completion on August 1, 2022. (*See* Cert. Admin. R at 310.) Bougie argues that Grove's dependence on Seiman's certificate of completion is purely hearsay since Seiman has not inspected the interior of the home to confirm completion. (Pet'r Br. at 7-8.)

9

The Assessor made numerous attempts to get Bougie to allow her to inspect the interior of his property as is permitted under Indiana Code Section 6-1.1-4-15(b), which provides:

> In order to determine the assessed value of buildings and other improvements, the township or county assessor or the assessor's authorized representative may, after first making known the assessor's or representative's intention to the owner or occupant, enter and fully examine all buildings and structures which are located within the township or county and which are subject to assessment.

Ind. Code § 6-1.1-4-15(b) (2022). Bougie denied the Assessor access claiming that his Fourth Amendment rights were being denied. The Fourth Amendment claim will be addressed below.

The Assessor then sought entry through an order issued by the Board pursuant to the property tax discovery regulation. It establishes that "a party may . . . obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.] 52 IND. ADMIN. CODE 4-8-3(a)(1) (2022). "Upon showing of good cause, including a description of independent efforts made to resolve the discovery dispute, the board may issue a discovery order" and "a party who fails to comply with a discovery order may be subject to sanctions." 52 I.A.C. 4-8-3(e).

The Board issued the discovery order on August 9, 2022, giving Bougie through September 10, 2022, to allow entry for inspection. (*See* Cert. Admin. R at 325.) Bougie denied entry claiming that both the statute and the regulation were unconstitutional. (*See* Cert. Admin. R. at 670.)

Bougie has used the lack of in-person inspection to challenge the validity of the assessment, the building certificate of completion, and Grave's appraisal as the result of inadmissible hearsay evidence. (Pet'r Br. at 7-9.) The lack of in-person inspection is not

10

through lack of willingness or effort from any of these parties. It is solely due to Bougie's refusal to allow access to the second floor, which would quickly answer the question about the second-floor addition's completion.

The Assessor's claim of completion was reasonable based both on external observation and on Bougie's own claims on his two building permits. The first building permit from August 25, 2015, estimated completion by August 1, 2016, and the updated permit indicating only minimal trim, cosmetic trim, and siding were left to be completed, was filed on July 19, 2018, and set a new completion date of December 1, 2019. (*See* Cert. Admin. R. at 82-83, 477-78.) Bougie then claimed that the improvements had not been made six years after the original estimated completion date, but he refused to allow inspection to validate his claim.

The Court denies Bougie's claim to overturn the Board's decision for lack of substantial evidence because a review of the evidence does not show the Board's conclusions to be clearly erroneous.

*Were Bougie's Fourth Amendment Rights Violated?*

Bougie asserts that the Board violated his Fourth Amendment right against unreasonable searches by ordering him to allow the Assessor to inspect the improved areas of his structure without a warrant or probable cause. (Pet'r Br. at 3-4.) Generally, the Fourth Amendment is thought of as applying to criminal matters. Bougie, however, cites a 1967 U.S. Supreme Court case to argue that the Fourth Amendment also requires that administrative inspections require warrants. (*See* Pet'r Br. at 4 (citing *Camara v. Mun. Ct. of City and County of San Francisco*, 387 U.S. 523 (1967)).)

11

The legal authority for the Board's order here rests, as addressed above, in Indiana Code and the regulations. Indiana Code section 6-1.1-4-15(b) provides:

> In order to determine the assessed value of buildings and other improvements, the township or county assessor or the assessor's authorized representative may, after first making known the assessor's or representative's intention to the owner or occupant, enter and fully examine all buildings and structures which are located within the township or county and which are subject to assessment.

I.C. § 6-1.1-4-15(b).

The property tax discovery regulation establishes that "a party may [] obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" 52 I.A.C. 4-8-3(a)(1). "Upon showing of good cause, including a description of independent efforts made to resolve the discovery dispute, the board may issue a discovery order" and "a party who fails to comply with a discovery order may be subject to sanctions." 52 I.A.C. 4-8-3(e).

The Court notes that no inspection of Bougie's property actually occurred. The Board also declined to sanction Bougie for violating the entry order requiring him to allow the Assessor access to inspect the contested property addition. (See Cert. Admin. R. at 637 ¶ 6.) So, Bougie's Fourth Amendment rights were not infringed.

The Court acknowledges Bougie's claim that there have been times where the Fourth Amendment has been applied to administrative actions. However, no ultimate criminal penalty was involved here unlike in *Camara*, and the inspection in the cited case is very different. There, the statute provided that:

> [a]uthorized employees of the City departments or City agencies, so far as may be necessary for the performance of their duties, shall, upon presentation of proper credentials, have the right to enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them by the Municipal Code.

12

*Camara*, 387 U.S. at 526.

Here, the statute is much more narrowly tailored and requires prior notification of the owner or occupant before inspection, and the discovery order gave Bougie a thirty-day period in which to allow the Assessor or the Assessor's representative entry to inspect the property. There is also the question of whether Bougie had a reasonable expectation of privacy from a scheduled inspection, especially as that inspection was needed to verify an adjustment in his property assessment that he requested.

The Court does not address that question or the underlying statute's constitutionality as no inspection ever took place. The Court, thus, rejects Bougie's Fourth Amendment claim.

### Does the Burden-shifting Statute Apply?

Finally, Bougie contends that the Indiana Board inappropriately assigned him the burden of proof for his 2021 assessment. Indiana Code section 6-1.1-15-17.2 applies to appeals filed on or before its repeal and replacement by Indiana Code section 6-1.1-15-20 on March 21, 2022. INDIANA CODE § 6-1.1-15-17.2(b) (2021) (repealed 2022). *Elkhart Cnty. Assessor v. Lexington Square, LLC*, 219 N.E.3d 236, 244 (Ind. Tax Ct. 2023). Bougie's 2021 assessment appeal was filed on December 10, 2021. (Cert. Admin. R. at 1.) This statute provided that when there is an increase in the assessment of more than five percent over the assessment for the same property for the prior year, the Assessor has the burden of proving the assessment is correct, which Bougie argues according to case law means "*exactly* and *precisely* conclud[ing] to [the] original assessment." (Pet'r Reply Br. at 1-2.), *Southlake Ind., LLC v. Lake Cnty. Assessor*, 181 N.E.3d 484, 489 (Ind. Tax Ct. 2021), review denied.

As Bougie's reply brief mentions, there is an exception to this burden-shifting rule. (Pet'r Reply Br. at 1.) The burden does not shift from the taxpayer to the Assessor "if the assessment that is the subject of the review or appeal is based on [] substantial renovations or new improvements [] that were not considered in the assessment for the prior tax year." I.C. § 6-1.1-15-17.2(C). Bougie contends that the "Board erred by not analyzing the evidence to determine if the exception" would have applied here. (Pet'r Reply Br. at 1.)

The Court finds the issue waived because Bougie did not raise the issue before the Board. The legislature has limited this Court's judicial review of appeals from the Board's final determinations to issues raised before the Board except for specific circumstances that do not exist in this case. I.C. § 33-26-6-3.

If the Court were to consider this belatedly raised issue, the outcome wouldn't be different because the Board analyzed the conflicting evidence and determined that Bougie's upstairs was substantially finished living space, meaning that the exception would have applied, and the Court can't reweigh the evidence on appeal. (*See* Cert. Admin. R at 641 ¶ 20.)

## CONCLUSION

The Court AFFIRMS the Board's final determination.